The next case today is Beatrice Mnyenyezi v. United States, appeal number 192041. Attorney Guerriero, please proceed with your argument. Good morning, your honors. May I reserve two minutes for rebuttal, please? You may. Thank you. Richard Guerriero for Beatrice Mnyenyezi. I would like to focus on the prejudice issue, the prejudice resulting from the failure to give the Maslin-Jacken instruction because that issue is central to both the argument and their questions. Before you go to that, I have a question. Yes, your honor. Is there any doubt that your client failed to disclose her membership in or association with the MRND and the Inter-Hawaii? Well, as to the MRND, I think she was asked on the forms was she associated with any and then I don't think that the authenticity of those forms and her signature on that is disputed. Wait a minute. My question is, is there any doubt that she failed to disclose her membership in that organization or the other one, Inter-Hawaii? Your honor, I guess I would have to qualify my answer with regard to the word membership. She did not disclose that she had attended. About association with? She did not disclose that. Okay. And who is that? Why was she not disclosing that? Why was she not disclosing that? Yes. I honestly do not know the answer to that. That's not in the record for this case. So, I mean, I have government evidence that she testified. Let me ask you this. If she had disclosed association with that organization, would that lead to either further questioning or disqualification to get entry to the United States, et cetera? So, there are a couple of different paths there. With respect to MRND, the witnesses testified that there would be further investigation, but their testimony stopped there. The government did not present any evidence of what would have been discovered. And, in fact, the government witnesses testified that there were many members of MRND who were not involved in the genocide. MRND was a political party. A separate path would be whether or not she was involved with the militia group. And that was something that was simply disputed and denied at trial. There were witnesses for the defense who testified that they never saw her wearing any military clothing, that she remained in the hotel from April through July of 1994. And, of course, there were witnesses for the government who testified to the contrary. Five minutes remaining. Okay. But if she had disclosed it, even though there was contrary evidence at trial, the government more than likely would have at least dug up the ones who testified on behalf of the government. And that alone would have been sufficient to deny her admission. I respectfully disagree with that, Your Honor, for the following reasons. Number one, her admission to citizenship, she became a naturalized citizen in 2003. The government did not present any evidence, either at trial or in the proceedings below in this case, that it would have discovered the information that they presented at the trial of this case about her participation in these activities back in 2003. And, in fact, if they had been put on notice, they would have explored. I think you may be asking the government to state the impossible. Why is there reason to think if they found it later, they would not have found it in 2000 or before 2003 if she had given them notice? Well, maybe the best example is the history of the two trials in this case. Whatever they found. I'm glad you brought that up because the next question I was going to ask you is what relevance does it have to our decision, in this case, the fact that a jury found that she was, in fact, a member of these organizations and actively participated in the criminal activities? Your Honor, I don't think that that was the jury finding. The jury finding was that one, at least one of the accusations in the indictments were true. They could have found that. That could be the basis for the jury's decision. It also could have been, as we think, most likely that she falsely stated that she was not associated with MR&D. If that was the basis of the jury's decision, which we don't know because there was no special verdict for him in spite of the trial judge's suggestion, then that means that under Maslin-Jack, she may well have had a very good argument at trial. If I may finish my previous answer, the fact that the first jury in this case hung is significant. Whatever the government tried the first time they tried to present their case, the jury couldn't make a decision. That is a pretty strong indication that even seven or eight years before that, officials from the State Department and the Immigration Service would have had a hard time as well. Or an easier time. Of course, I respectfully disagree, Your Honor. One point I want to make about evaluating the evidence here is that with regard to how the harmless error standard is viewed, both the trial court and the government emphasize the government witnesses with little or no discussion of the defense witnesses. That really sort of tracks the normal sufficiency review. In fact, the trial court's order followed this court's opinion on the original appeal, which of course was the normal sufficiency review, reviewing the evidence in the light most favorable to the government, giving all the credibility determinations favored towards the government. I don't think that is the proper standard here for the recited cases in our brief. To ignore the defense witnesses who described her as someone who was trapped in this hotel, a woman who had a small baby, who was pregnant with another baby, who was under the influence of her in-laws and her husband, who in fact helped Tutsis. Witnesses testified that she helped more than one Tutsi who had sought refuge at the hotel. Counsel, if I might interject two questions. One, I wanted to clarify what you were saying in response to Judge Torway's questions. Are you saying now in appeal that you're conceding that she was a member of MRND? Well, the member, again, I go back to the word member. Was she, so were there activities around the hotel? That's not my, that's not my question. Below, below, in closing arguments, counsel said she was not a member of MRND. There was no evidence whatsoever that she was a member of MRND. And I, I guess I was puzzled by your answer to Judge Torway because if that is the position, then you would not be conceding she answered that application necessarily falsely. No, I think that my issue was with the word membership. I don't think that, we're not conceding that she was a member, but there were certainly activities and rallies around the hotel and obviously her husband was involved. So, to the extent that she was associated. I've read the closing, the closing arguments in this case made virtually no mention whatsoever of causation. It seemed the whole case pivoted on were these witnesses that the government brought in telling the truth or instead were they simply out of fear and desire to appease authoritarian figures sticking to some fictional narrative. That, that seemed to be what the arguments entirely pivoted on. Am I misreading them in that respect? No, no. If I may take a minute to answer, Your Honor. No, you're not misreading the arguments. And, you know, the government argues that it's a point in their favor that the defense did not contest causation at the trial. And what I would suggest is that the law at the time was such that there wasn't a valid basis or a good basis for them to contest causation. The law was a very confusing standard, which a natural tendency or capacity to influence, which is far different from the standard we have now under Maslund's Act, which is actual influence. And my suggestion is that if defense counsel had known or if it had been the case that actual influence was an element and had to be proven, then counsel would have made that part of their case. Thank you. I believe I'm out of time. All right. Thank you. Judge, if I may, at this time, we can hear from Attorney Quinn Liven. Please. Good morning, Judge Turay. And may it please the Court, Mark Quinn Liven, Good morning. Good morning. Good morning. I also want to focus on the prejudice harmlessness issue because it does go to two things. There's any serious dispute that the false answers to the second and third questions alleged in the indictment would itself have led to disqualifying facts. And that is the Supreme Court, of course, in Maslund's Act said that if a false answer, a truthful answer would have revealed a disqualifying fact, then causation, the causation element is obvious. The most significant dispute that my friend has made really goes to the first question, which is that Ms. Munyanyesi failed to disclose her membership and or association with the MRND and the Interahamwe. And I think it's important to note that if it were just the MRND, as we've noted in our brief, there was testimony at trial that the interview would be stopped and further investigation and questioning would have begun. But this isn't a case simply about Ms. Munyanyesi's membership and or association with the MRND. Because there also was testimony at trial. Not only that her husband was the local militia leader of the Interahamwe, but that Ms. Munyanyesi herself was associated with that group. And if I could just identify very quickly and direct your honors to the record. Early on in the trial, a man named Thierry Sabaganwa testified that he had been in primary school with Ms. Munyanyesi's husband, Shalom Nitahobali, and had known him since then. He was asked, was Shalom a member of the Interahamwe? His initial answer was, and she knows it. The government then said, you have to answer yes or no. And he answered yes. And that was on page 285 of the appendix. He then testified subsequently that he saw her on two occasions in MRND and Interahamwe. Three of the witnesses who testified about the roadblock that we cited in our brief also testified that they saw Ms. Munyanyesi at the roadblock. One, Vestine Nyarimani testified that she saw an Interahamwe named Beatrice at the roadblock who asked for the identity cards. And that she knew her to be Shalom's husband. John Paul Rutaganda said that he saw Ms. Munyanyesi wearing an Interahamwe uniform. And Consul Muka Shamana testified that she saw Ms. Munyanyesi wearing military clothing and checking for cards. And I think that the significance of that additional testimony is that Mr. Hepburn testified at trial that there was a distinction, that they would have asked additional questions about the MRND. But if she had disclosed the fact that her husband was the head of a local Interahamwe militia, that would have been a red And as I know, the evidence in this case is not simply that Ms. Munyanyesi's husband was a member of the Interahamwe, but that she herself was either a member and or associated with, and in fact, people saw her wearing Interahamwe garb. So, I see where Heflin testified that if she had said yes, she was associated, he would have asked a follow-up question. And we can infer the follow-up question might have been what the association is. And then he would have learned she was married to an Interahamwe leader. And he said that would have raised a red flag. And then he stops. Are you equating the raising of red flag with the predictably led to a discovery of a disqualifying characteristic? Um, yes, Judge Kayada, because I think, recall that she was applying for naturalization in 2003. So, it was much closer to the events in question. Five minutes remaining. But in further answer, Judge Kayada, I think it's, you can, one can easily envision what those, what that further investigation would entail. I think the first question that would have been asked is, what was Ms. Munyanyesi doing during the genocide? Well, the answer, and it was undisputed on both sides, was that she was at the Hotel Ihururu during the genocide. What's unusual is you're asking me to envision that that would have been the question. All these witnesses on the stand, I don't think any of them ever get to point of saying, and here's what we would have asked. I don't remember, Judge Kayada, you're correct. Um, um, um, I would point to, uh, uh, Mr. Heflin's testimony when he talked about this, when he said that would have been a red, red flag. This is about the Inter-Ohamwi. He said, well, I'm sure the MRND had some people in it that never participated in the genocide. The Inter-Ohamwi were leaders in the genocide, and then when they stepped out of the country, were launching armed attacks back into Rwanda. He then went on to say, we might have gone back and asked some questions, but we might have just said that we weren't able to approve this refugee processing and moved on to the next person. Like I say, we have plenty of people trying to come here who don't have these problems. We've been talking about the MRND. Is there any reason why, in this case, we need to assume that the only false answer the jury found her to give was her question of whether she was associated with the MRND? In doing the actual prejudice analysis, are we entitled to look at all the evidence as a whole and asking whether the jury verdict would likely have been the same? Um, yes. I think, um, as we noted that, um, because this was a general, uh, verdict form as a, as a, as a general matter under Griffin, um, um, the jury verdict can be sustained if any, uh, if the jury could have found any of the five answers. Really only three are at issue because the fourth and fifth questions required the jury to find that one of the first three was a false answer. But that's what we would do. That's what we would do if we had a challenge to the sufficiency of the case. And they were given three reasons. The evidence was insufficient as to one, but it was sufficient as to one of the others. So, we would say, if any of the reasons, that's enough. But we're not doing that analysis here. We're, we're actually doing, we're doing an actual prejudice argument. That's right, Judge Kayada. And that's why we noted in, in our brief that because the district court said that the jury had to find, that all five, that, uh, the harmlessness would apply to all five answers, um, the government submits that that showing has been made. Once again, the first two answers themselves, uh, she failed to reveal facts which would have made her ineligible for citizenship. Um, the answer to the first would have led to facts that predictably would have led to, um, um, a disqualifying fact. And the fourth and fifth questions are subsumed within the first three. Um, Judge Kayada, just to follow up one point on that, because you, you, you pointed out that there wasn't testimony about what those questions were, but there was testimony in this case from Dr. Longman, um, that the roadblock in front of the Hotel Uhuru was one of the most notorious, uh, roadblocks in all of Rwanda during the genocide. Um, and that, uh, Ms. Munyenyezi's husband, uh, Shalom Nito Habali was one of the bloodiest of the killers. Um, so I think that's significant testimony, um, when coupled with the fact that, uh, it was undisputed at trial that Ms. Munyenyezi was living at the Hotel Uhuru during the genocide. Um, thank you. Thank you. Thank you. Attorney, uh, Guerriero, uh, you have a two minute rebuttal. Okay. Thank you. Can everyone hear me? Yes. Okay. Um, I think I'll pick up, uh, on the point that the government left off on regarding, uh, the witness, um, Dr. Longman. Um, you know, the government has relied on that and the notoriousness of this roadblock and the hotel. Dr. Longman, in fact, testified that in spite of all of his knowledge and all of his investigation, he never heard that Shalom was married and he never heard the name Beatrice Munyenyezi during his research. So if the government is relying on him, uh, you know, we would point to that particular, uh, aspect of his research as indicating that she was not involved and not participating the way the government says that she was. Um, with respect to other witnesses, uh, just to counter the government's points on the testimony about military clothing, uh, and I'm sure I won't get the names pronounced correctly, but, um, on pages 1371 through 78 of the record, um, the, uh, witness whose son was a Tutsi testified that she had her baby with her, um, uh, that she had her son with her, that she fled to the hotel. She never saw Munyenyezi wearing any military clothing, uh, which would relate to the inter-hamwe accusation. Similarly, at pages 1392 through 1400, um, uh, Habenshuti, a witness, a cook said there were many refugees hiding at the hotel and he only saw Munyenyezi sick and pregnant, uh, and he never saw her wearing any military clothing. So is there any doubt that the roadblock was in front of the hotel? And is there any doubt that the person in charge of that roadblock was, uh, your client's, uh, husband? The defense did not contest his involvement. Um, so in pointing out that the, the, both the flaws in the government's, the testimony of the government's witnesses and the contrary defense, uh, witnesses, I'd ask the court to note that, um, in the Singleton case, uh, and in the, uh, Sustache Rivera case, both cited by the government, um, the burden is on the government here in this harmless error analysis. It's really a different situation than sufficiency. And in fact, in, um, the Sustache case, uh, the court said, um, we asked whether the government can show that the error did not have a substantial and injurious effect. Thank you, your honors. Thank you. That concludes the arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court.